PROVO STY, J.
On October 24, 1913, the J. H. Menge & Sons, Limited, of New Orleans, entered with the Edwin H.. Fitter Company, of Philadelphia, Pa., into the following contract:
“J. H. Menge & Sons, Ltd., New Orleans, La. — Gentlemen: We agree to consign you pure manilla, pure sisal, pure New Zealand and Diamond ‘S’ cordage, as you may specify from time to time, which goods shall be held by yon on consignment only, are to be our property and sold by you as our agents, and the quantity so consigned shall not exceed a total of 150,090 pounds at any one time, including the unsold stock you may have pn hand and also goods in transit from Philadelphia. Prices we make will be f. o. b. Philadelphia, you to pay freight charges and we to allow you three cents cartage and all freight charges over twenty-five cents per hundred pounds, on carload shipments to New Orleans, you to keep the goods safely stored, without charge to us, and your profit to be all you can obtain over our price to you. We will telegraph you promptly of any changes in the prices we make, and all unsold stock shall be subject to such market changes. All sales in any one month to be -reported to us by the 10th of month following, and if paid for by that time, to be less a discount of 1% per cent, for cash; otherwise to be net 60 days from 1st of month following sales, you to have exclusive sale of manilla, sisal, New Zealand and cordage in the states of Louisiana, Mississippi, Alabama, and Florida, with the exception of Tampa, Port Tampa, and Jacksonville, Fla., and you to handle no other make of goods in our line. All manilla and sisal shipped by us to he marked Fitter. On any direct sales accepted by us and charged at our prices, we will allow 1 per cent, commission. It is also understood and agreed that the Edwin H. Fitter Company, through its officers or appointees, shall, at all times, during business hours, have the right to enter upon the premises of the above-named agent and inspect the goods so consigned by the Edwin H. Fitter Company to the said agent under this agreement; this agreement to be in force until canceled by either party giving thirty days’ notice *667 of their desire to terminate the same, and at the termination of this contract by such notice or from any other cause, the above-named agent shall return any balance of goods, consigned as above and remaining unsold, to Philadelphia or any other point designated by the Edwin H. Fitler Company; and on the failure of the agent so to do, we, the owners of the goods specified herein (or any other qualities that may be consigned by us to you as said agents) shall have the right to enter upon the premises of said agent and carry away such goods, without any interference on the part of the said agent. It is understood and agreed further that acceptance of this contract by both parties, herein mentioned, shall void any previous consignment agreements which may have existed between them.
“Yours truly, The Edwin H. Fitler Co.”
Since 1897 these two companies had been doing business under a contract of like tenor.
On November 28,1913, the Menge Company was put in the hands of a receiver. It then had on hand a lot of cordage received under said contract, and also bills receivable for cordage which it had received under said contract, and had sold on a credit. The receiver readily admitted that the cordage on hand belonged to the Fitler Company, but would not make the same admission as to the bills receivable; and accordingly he placed that company on his account as a mere ordinary creditor for the amount in which the Menge Company was accountable under said contract for the goods sold. 1-Ie denied that the Fitler Company owned said bills receivaule, or had a privilege thereon. In that connection said company invokes the following article of the Code:
“Art. 3248. In the event of the failure of the consignee or commission agent, the consignor has not only a right to reclaim the goods sent by him, and which remained unsold in the hands of the consignee or agent, if he can prove their identity, but he has also a privilege on the price of such as have been sold, if the price has not been paid by the purchaser, or passed into account current between him and the bankrupt.”
[1, 2] The admission that the goods remaining on hand belonged to the Fitler Company carries with it the admission that the goods which were sold belonged to that company, and, as a consequence, that their price so belonged up to the amount of said company’s-share therein; for all the goods stood on precisely the same footing. But we do not consider that the receiver, representing, as he-does, the creditors of the insolvent company, and not acting in his own right, could bind the receivership by an admission of that kind; hence the question of the ownership, of the goods sold is still open for adjudication.
[3] In cases of this kind, the manner in which the parties carried out the contract,, thereby interpreting it, tends to show what was its real character, what the parties, really intended that it should be. The facts, in that connection are stated in the receiver’s brief as follows:
“Under the contract aforesaid Menge and Fitlor did business in this manner. The Fitler items and all other items were entered together confusedly on the Menge books. In order to ascertain what were Fitler items, recourse had always to be had to the original contemporary sales tickets. All of the Fitler items were entered into the ledger without any specific means of identification, and no separate account, as. we have seen, was kept of the Fitler items. The Fitler rope when sold was collected by Menge, and Fitler had nothing to do with collecting it. Fitler never knew to whom Menge had sold, nor on what items of credit. At the end of each month Menge would advise Fitler that it had made gross sales to a certain amount. Fitler would then bill Menge for the current market price of those gross sales. Fitler then permitted Menge to settle within 60 days of that time with a 2 per cent, discount for payment within 10 days. If at the end of this time Fitter’s account was not settled with Menge, it was customary for Menge to give to Fitter its note indorsed by the officers of the concern. This course of dealing was followed by Fitler and Menge for a period approximating 5 years down to the date of the receivership. When Fitler shipped rope to Menge, it shipped the rope upon a request of Menge that he required a certain quantity of rope. With this shipment Fitler sent Menge an invoice. When Menge received this rope, it sold it as it did other articles in its stock to whom it pleased and when it pleased on whatever terms it pleased. Fitler then looked exclusively to Menge for the collection of its account. The Menge Company never once rendered an account of individual sales to Fitter. It never once gave Fitler the names of the customers to whom the sales had been made. It never once gave Fitter the terms and conditions of its sales, nor was it - ever called upon by *669 Eitler to do so. When Menge sold Fitler rope, it billed that Fitler rope to its own trade and to its customers as though it were its own property. When Menge collected from its customers its various accounts in which were included Fitler rope, the proceeds were deposited in the Menge general bank account, and it was used in meeting the expenses of Menge’s current business. It was never kept in a separate bank account. Menge carried the insurance on this rope for its own account, and when Menge sold the rope, and suffered a loss on the sale, "Menge suffered the loss. Menge sold the rope at whatever price it chose to sell it, and Menge’s profit was the difference between what Menge sold the rope for, and what Fitler charged him for the rope. Menge was responsible for the safe custody and control of the rope, and Fitler had nothing to do with its control physically. The proceeds of the Fitler rope were kept by Menge confusedly in its general bank account, together with other funds.”
That statement conforms with the record;' but the record does not make clear that any of the goods were sold below the price fixed by the Fitler Company, or without a profit; and, as there is no likelihood that such a thing ever was done, we understand that whatever loss may have been suffered on any sales was the result of inability to collect the price, and not from a selling below the price fixed by the Fitler Company. Only one witness testified on that point, the former bookkeeper of the Menge Company, and the following is the whole of his testimony in that connection:
“Q. When Menge sold Fitler rope and made a loss on the sale, who suffered that loss? A. The Menge Company. Q. What was Menge’s profit on the sale of Fitler rope? A. I haven’t any recollection of it now. Q. Generally speaking? A. About 4 or 5 per cent. Q. In other words, the profit was ascertained in.this manner. The rope was sold by Menge Company at whatever price it chose to sell it? Isn’t that correct? A. Yes.”
That a separate account was not kept of the sales, an'd that the part coming to the Fitler Company in the price was not kept separate, we do not consider significant. The Fitler Company was not interested in the manner the account and the money were kept, so long as the goods unsold did not lose their identity and the Menge Company continued to be solvent. And also the fact that the Menge Company was allowed to sell for as much above the price fixed by Fitler Company as it pleased, is insignificant, since the contract gave it the privilege of so doing. It was in that way the Menge Company was to be compensated for attending to the business. The contract certainly did not contemplate that the goods should, or might, be sold below the price fixed by the Fitler Company. Whether, if the Menge Company ‘had made it a practice to sell below the price thus fixed, and the Fitler Company, knowing it, had never objected, this might not have had a tendency to show that in the intendment of the parties the goods belonged to the Menge Company, despite any words in the contract to the contrary is a point we need not consider, since there is no proof of such a practice, and no probability of it, and still less with the Fitler Company’s knowledge.
[4] The contract, upon its face, we have no hesitation in pronouncing a mere agency. It is so worded, and nothing shows that in this wording the parties did not express their real intention. The arrangement was one for the convenience of the parties; and, as there was in it nothing contrary to law, good morals, or public policy, there was no reason why they should not noth make it and carry it out in the manner they pleased. Practically the denial that this was a mere agency amounts to a denial that such an arrangement as this agreement evidences and is said by the Fitler Company to have been is a legally possible one; but why such an arrangement should he legally impossible it would be hard for any one, we think, to assign’ a reason.
The learned counsel for the receiver refer us to cases where double-faced contracts, looking both to sale and agency, have been pronounced to be sales. But that was be *671 cause there were features in them which were characteristic of sale, and inconsistent with agency. Thus in D. M. Ferry & Co. v. Hall, 188 Ala. 178, 66 South. 104, L. R. A. 1917B, 620, mainly relied upon by counsel, the court laid stress upon the clause obligating the D. M. Perry Company to “buy back” the goods unsold. Such a clause was absolutely inconsistent with the continued ownership of the goods by the D. M. Perry Company.
Not only the contract in our case contains nothing Inconsistent with agency, but it contains something absolutely inconsistent with sale. We refer to the absence of a fixed price. The goods were ordered with nothing said, or understood, about price. The price was, and continued to be, whatever the Pitler Company might at any time fix, by letter or telegram.
“We will telegraph you promptly of any changes in the prices we make, and all unsold stock shall be subject to such market changes.”
We can see no utility in lengthening this opinion by a review of the other cases cited by the learned counsel for the receiver. If they were not distinguishable from the present one, we should not bo influenced by them, so clearly does the said contract appear to us to have been one merely of agency. Greater deference than this, however, has to be paid to a decision of the highest court in the land, and therefore we will add that we do not find Dr. Miles Medical Co. v. Park, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, to be at all in point. The court there did not pass upon the nature of the contract, as being a sale or an agency, but rneerly said that, even if, in spite of the allegations of the plaintiff company to the contrary, the contract was held to be an agency, still the plaintiff would have no case. The court seemed disposed to consider the contract to be an agency despite the allegations of the plaintiff company to the contrary.
Judgment affirmed.