**CENTRAL OIL & SUPPLY CORPORATION, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee, Appellant,**

v.

**James C. WATSON, William Watson, Mrs. Clemmie McIntosh Watson, and Gerald B. Watson, Additional Defendants on Counterclaim-Appellees.**

No. 75–2372.

United States Court of Appeals, Fifth Circuit.

Aug. 12, 1977.

Rehearing and Rehearing En Banc Denied Oct. 11, 1977.

Robert Lee Curry, III, J. Michael Hart, Monroe, La., for Central Oil & Supply.

Donald F. Wood, John E. Kennedy, Houston, Tex., for Richard R. Broach, Jr., amicus curiae.

Donald E. Walter, U. S. Atty., Lawrence L. Jones, Asst. U. S. Atty., Shreveport, La., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Gilbert E. Andrews, Acting Chief, Appellate Sec., Grant W. Wiprud, William A. Whitledge, U. S. Dept. of Justice, Washington, D. C., for the U. S.

George M. Snellings, III, Carrick R. Inabnett, Monroe, La., for James C. Watson et al.

Before WISDOM, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

Central Oil & Supply Corporation [Central] filed this suit in the district court to secure a refund of federal excise taxes levied on the retail sale of diesel fuel for use in highway vehicles which it paid for the first quarter of 1969. The United States counterclaimed to obtain payment of the tax due on sales allegedly made by Central during the last three quarters of 1969, all of 1970 and 1971, and the first two quarters of 1972. It joined James C. Watson, Gerald B. Watson, and Clemmie M. Watson, d/b/a Watson's Truck Stop, as third party defendants to its counterclaim. The parties agree that taxable retail sales of diesel fuel were made, and that either Central or the Watsons made them. The sole issue presented by this case is whether the transfer of diesel fuel from Central to the Watsons was a "sale for resale" or a "consignment for sale." If it was the former, then the Watsons sold the fuel for use in highway vehicles and are liable for the tax; if it was the latter, then Central made the taxable sales through the Watsons' agency and must pay the tax owing. The district court resolved the controversy against Central. We affirm.

I. Factual and Procedural Background

In 1968 James, Bill,[1] and Fred[2] Watson became interested in opening a truck stop on property they owned adjacent to the intersection of two major highways near Calhoun, Louisiana. They approached Central, a petroleum products jobber which distributes fuels and lubricants to a number of service stations and direct industrial customers, for assistance in financing and constructing the necessary improvements. The discussions proved fruitful. In exchange for Central's commitment to build the truck stop and arrange for a loan, the Watsons executed a promissory note secured by a mortgage on approximately 45 acres of their property which Central was to use to obtain interim financing for the project.

By January of 1969 the truck stop was ready for operation. Shortly thereafter, the Watsons replaced their first promissory note with a larger one made payable to a Central affiliate, W. J. & C. Sherrouse, Incorporated [Sherrouse], pledging their land and the new improvements as security. In a letter to the Watsons, Sherrouse and Central promised to periodically release portions of the land from the mortgage in order to reflect the amortization of the note. This obligation was conditioned on the Watsons' covenant not to market petroleum products other than those supplied by Central on the released parcels. The Watsons then leased the truck stop to Central for 15 years, renewable at Central's option for three additional terms of five years each, and assigned their rental income under the lease to Sherrouse. Central immediately leased the premises back to the Watsons for 15 years. The leaseback agreement, however, does not include a provision for renewal at the Watsons' option.

---

1. James Watson purchased his brother Bill's interest in the truck stop in 1973.

2. Fred Watson died during the pendency of this lawsuit. Since his wife Clemmie and his son Gerald were his sole heirs, they were substituted for him as additional defendants on the counterclaim.

As a result of this exchange of leases, Central acquired a considerable amount of control over both the truck stop and the land on which it was built. The lease agreement authorizes Central to construct, install, and alter any additional improvements or equipment it wishes to place on the premises, and to paint any part of the truck stop whatever color it pleases. In addition, Central has the right to match any bona fide offer which the Watsons receive for the purchase of the truck stop or the property, and unrestricted permission to assign or sublease its leasehold interest. The leaseback agreement prohibits the Watsons from painting or modifying the existing structures and equipment, and from transferring their leasehold interest without Central's consent. It also gives Central the right to enter the premises without notice for the purposes of inspection and the making of repairs.

Central furnishes the Watsons with gasoline and diesel fuel pursuant to an unwritten understanding which closely tracks Central's customary practices in dealing with other service stations over the years. While the truck stop was under construction, Central installed underground storage tanks, connecting lines, and dispensing pumps on the premises. This equipment remains Central's property, and neither the Watsons nor their employees can open the pumps or unlock the access ports to the tanks. As soon as the truck stop opened for business Central placed gasoline and diesel fuel in the underground tanks. While in the tanks, connecting lines, and pumps, the fuel belongs to Central and the Watsons have no responsibility for it. Central carries the fuel stored at the truck stop as an inventory item on its books, insures it against loss, and increases or decreases the volume of fuel stored in the tanks whenever it wishes.

The Watsons are totally dependent on Central for their supply of diesel fuel. Central routinely inspects the underground tanks and determines the volume of fuel they contain as a precaution against theft and the Watsons' receipt of fuel from other suppliers, but the Watsons learn of the amounts of fuel in the tanks only on those rare occasions when they pump them dry. When this occurs, the Watsons telephone Central to request the delivery of additional fuel. Once, while the petroleum fuel shortage was especially acute, Central was unable to meet the Watsons' demands. Although the Watsons succeeded in locating an alternative source of supply, they could not purchase the fuel because they had nowhere to store it. Instead they were forced to notify Central, which then purchased the fuel from the alternative source and delivered it to the truck stop.

A Central representative visits the truck stop every Friday to check the cumulative meters on the pumps and to determine how much fuel has been removed from the storage tanks during the preceding week. He bills the Watsons for the amount of fuel pumped at the rate per gallon on which they had agreed the previous Friday. At the same time, the price that the Watsons will be charged for fuel removed from the tanks during the ensuing week is negotiated, and after an agreement is reached, the Central representative sets the pump price at the level specified by the Watsons. The Watsons retain as their profit the difference between the pump price and the price they agreed to remit to Central. This difference is narrowed by the Watsons' policy of discounting the pump price in order to keep abreast of their competitors. It is undisputed that the Watsons exercise exclusive control over the prices they charge their customers, the terms of credit they offer, and the truck stop's hours of operation. Nevertheless, the record indicates that all of the diesel fuel removed from Central's storage tanks by the Watsons during 1969–71 and the first two quarters of 1972 was pumped directly into the tanks of diesel-powered highway vehicles.

There was no written agreement between Central and the Watsons concerning either the nature of the arrangement under which diesel fuel was transferred between them or the allocation of liability for the federal

excise tax on the sale of diesel fuel. Each apparently assumed that the other was paying the tax.[3] When the Internal Revenue Service assessed them with nearly identical deficiencies of more than $125,000 (the entire amount of the unpaid taxes, plus interest), they both paid the amount due for the first quarter of 1969 and filed refund claims. As soon as Central discovered that its claim had been disallowed, it brought this suit to overturn the Commissioner's determination. The United States counterclaimed for the balance of the tax and interest due, and joined the Watsons as additional defendants to its counterclaim. On cross motions for summary judgment filed by Central and the United States, the district court ruled that the relation between Central and the Watsons was one of consignment, and held Central liable for the tax. Central appeals. The United States has filed a protective cross-appeal from the dismissal of its claim against the Watsons, and from the district court's command that it refund to the Watsons the tax and interest they paid for the first quarter of 1969. It urges that we direct the district court to enter summary judgment against them should Central prevail here.

## II. The Entry of Summary Judgment for the United States

■ A litigant is entitled to summary judgment if, and only if,

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show [1] that there is no genuine issue as to any material fact and [2] that the [he] is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

Since the United States has met its burden of demonstrating that these two requirements are satisfied, the district court's decision granting its motion for summary judgment against Central was correct.

**3.** Although the briefs are unclear on this point, it appears that from July 1, 1972, to March 1, 1975, the Watsons paid the excise tax due on sales of diesel fuel made at the truck stop.

## A. The Absence of a Genuine Issue as to any Material Fact

■ We agree with the district court's determination that this case was ripe for summary judgment. Even when examined "in the light most favorable . . . to the party opposing the motion," *Poller v. Columbia Broadcasting Systems*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed. 458, 464 (1962); *E. C. Ernst, Inc. v. General Motors Corp.*, 537 F.2d 105, 108 (5th Cir. 1976), the record discloses no material facts, or material inferences that may permissibly be drawn from those facts, over which reasonable men could differ. *See Eutectic Corp. v. Astralloy-Vulcan Corp.*, 510 F.2d 1111, 1115 (5th Cir. 1975); *Doyle v. Bethlehem Steel Corp.*, 504 F.2d 911, 913 (5th Cir. 1974). The only genuinely disputed issue is the legal question whether the transfer of diesel fuel was a sale or a consignment.

■ Central argues that because it disagrees with the account of the facts as presented in the district court's memorandum opinion, issues of fact that did not exist prior to the court's ruling suddenly appeared after it was handed down. We agree with Central that the district court's recitation of the established facts is in some respects inaccurate, and to the extent that it is, we decline to rely upon it. But we do not accept Central's theory that factual issues sufficient to preclude disposition of a case on cross-motions for summary judgment can be "spontaneously generated" by a district court's opinion. If no issues of material fact are created by the clash of affidavits and other materials submitted by the parties in support of their motions, then the first requirement of Rule 56 has been met.

## B. The United States' Entitlement to Judgment as a Matter of Law

■ Section 4041 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 4041 (1967 & Supp.1976), imposes an excise tax of four

Since March 1, 1975, Central has paid the tax for the accounts of all of the service stations with which it does business.

cents per gallon on the sale of diesel fuel "to an owner, lessee, or other operator of a diesel-powered highway vehicle, for use as fuel in such vehicle."[4] Under the regulations promulgated to implement Section 4041, mere sales for resale are not taxable. Treas.Reg. § 48.4041–4(b)(1) (1976). The regulations further provide:

> The tax is payable by the person who makes the taxable sale. Where a taxable liquid is consigned to a person for sale and the consignor retains ownership in such liquid until it is disposed of by the consignee, the consignor is the person liable for the tax when a taxable sale of the liquid is made by the consignee. In the event the consignor does not retain ownership in the taxable liquid, the consignee is the person liable for the tax upon the taxable sale of such liquid.

Treas.Reg. § 48.4041–4(b)(2) (1976).[5] Since the crucial question is who owned the diesel fuel at the time it was sold to customers of the truck stop, we must determine the nature of the transfer from Central to Watson's by reference to Louisiana law. As the Supreme Court explained in *United States v. Mitchell*, 403 U.S. 190, 197, 91 S.Ct. 1763, 1768, 29 L.Ed.2d 406, 412 (1971),

> In the determination of ownership, state law controls. "The state law creates legal interests but the federal statute determines how they shall be taxed."

*Quoting Burnet v. Harmel*, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199, 204 (1932); *Accord Morgan v. Commissioner of Internal Revenue*, 309 U.S. 78, 80–81, 60 S.Ct. 424, 425–26, 84 L.Ed. 585, 588 (1942).

■ The district court's foray into the pertinent Louisiana law was far too superficial. Noting that the court in *C. V. Hill & Co. v. Interstate Electric Co.*, 196 So. 396 (La.App.1940), had quoted with approval the definitions of "Sale or Return" and "Consignment for Sale" contained in 55 Corpus Juris §§ 592 & 593, the district court concluded that the Louisiana courts would look to the common law in order to determine whether the transfer of diesel fuel from Central to the Watsons was a consignment or a sale. Accordingly, the district court relied upon a number of federal decisions, including some handed down by this court, applying the law of other states. This was error. Our obligation in characterizing business relationships for the purpose of determining the incidence of federal tax liability is to apply the relevant decisions of the highest court of the subject state. Only if there are none may we rely on decrees of the lower state courts or the common law. *See Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 466–67, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886, 894 (1967); *Estate of Salter v. Commissioner of Internal Revenue*, 545 F.2d 494, 497 (5th Cir. 1977). Since the

---

**4.** The complete text of the pertinent portion of Section 4041 is as follows:

(a) Diesel fuel—There is hereby imposed a tax of 4 cents a gallon upon any liquid (other than any product taxable under section 4081)—

(1) sold by any person to an owner, lessee, or other operator of a diesel-powered highway vehicle, for use as a fuel in such vehicle; or

(2) used by any person as a fuel in a diesel-powered highway vehicle unless there was a taxable sale of such liquid under paragraph (1).

In the case of a liquid taxable under this subsection sold for use or used as a fuel in a diesel-powered highway vehicle (A) which (at the time of such sale or use) is not registered, and is not required to be registered, for highway use under the laws of any State or foreign country, or (B) which, in the case of a diesel-powered highway vehicle owned by the United States, is not used on the highway, the tax imposed by paragraph (1) or by paragraph (2) shall be 2 cents a gallon. If a liquid on which tax was imposed by paragraph (1) at the rate of 2 cents a gallon by reason of the preceding sentence is used as a fuel in a diesel-powered highway vehicle (A) which (at the time of such use) is registered, or is required to be registered, for highway use under the laws of any State or foreign country, or (B) which, in the case of a diesel-powered highway vehicle owned by the United States, is used on the highway, a tax of 2 cents a gallon shall be imposed under paragraph (2).

**5.** Neither Central nor the Watsons challenge the validity of the regulations. *See generally Continental Equities, Inc. v. Commissioner of Internal Revenue*, 551 F.2d 74, 82 (5th Cir. 1977).

Louisiana Supreme Court has expressed its views on the distinction between a consignment and a sale under Louisiana law, the district court's reliance on *Hill* was misplaced.

The Louisiana Supreme Court wrestled with the distinction between a consignment and a sale in *A. J. Nelson Manufacturing Co. v. J. H. Menge & Sons, Ltd.,* 142 La. 664, 77 So. 494 (1918).[6] A controversy had arisen concerning the allocation of assets among the creditors of an insolvent corporation. The controlling issue in the case was whether the bankrupt had operated as the consignee of the Edwin H. Fitler Company. If so, then the Fitler Company owned some of the property and accounts receivable that were in the possession of the bankrupt at the time it was placed in receivership, and was not a mere creditor with respect to those assets.[7] The receiver had denied the Fitler Company's claim of privilege with respect to the accounts receivable, but the Civil District Court sustained the Company's position. The Supreme Court affirmed, holding the relation between the Fitler Company and the bankrupt had been one of consignment rather than one of sale. It rested its decision on the following grounds: first, that the language of the Fitler-Menge contract repeatedly refers to their relation as a consignment; second, that neither the contract nor the parties' course of dealing reveals any terms or behavior inconsistent with the existence of a consignment; and third, that the failure of the contract to establish a fixed price was "absolutely inconsistent" with the existence of a sale.

The essential terms of the agreement between the Fitler Company and J. H. Menge & Sons, Ltd. [the bankrupt] are set out in a letter which the Louisiana Supreme Court found typical of the terms under which they had done business from 1897 until the bankrupt was placed in receivership on November 28, 1913.

J. H. Menge & Sons, Ltd., New Orleans, La.—

Gentlemen: We agree to consign you pure manilla, pure sisal, pure New Zealand and Diamond "S" cordage, as you may specify from time to time, which goods shall be held by you on consignment only, are to be our property and sold by you as our agents, and the quantity so consigned shall not exceed a total of 150,000 pounds at any one time, including the unsold stock you may have on hand and also goods in transit from Philadelphia. Prices we make will be f. o. b. Philadelphia, you to pay freight charges and we to allow you three cents cartage and all freight charges over twenty-five cents per hundred pounds, on carload shipments to New Orleans, you to keep the goods safely stored, without charge to us, and your profit to be all you can obtain over our price to you. We will telegraph you promptly of any changes in the prices we make, and all unsold stock shall be subject to such market changes. All sales in any one month to be reported to us by the 10th of month following, and if paid for by that time, to be less a discount of 1½ per cent for cash; otherwise to be net 60 days from 1st of month following sales, you to have exclusive sale of manilla, sisal, New Zealand and cordage in the states of Louisiana, Mississippi, Alabama, and Florida, with the exception of Tampa, Port Tampa, and Jacksonville, Fla., and you to handle no other make of goods in our line. All manilla and sisal shipped by us to be marked Fitler. On any direct sales accepted by us and

---

**6.** Neither the parties nor the district court mentioned *Nelson.* Since the decisions on which they did rely are without exception either inapposite, deficient in some essential respect, or overshadowed by *Nelson,* discussion of them is unnecessary.

**7.** La.Civ.Code Ann. art. 3248 (West 1952) provides:

In the event of the failure of the consignee or commission agent, the consignor has not only a right to reclaim the goods sent by him, and which remained unsold in the hands of the consignee or agent, if he can prove their identity, but he has also a privilege on the price of such as have been sold, if the price has not been paid by the purchaser, or passed into account current between him and the bankrupt.

charged at our prices, we will allow 1 per cent commission. It is also understood and agreed that the Edwin H. Fitler Company, through its officers or appointees, shall, at all times, during business hours, have the right to enter upon the premises of the above-named agent and inspect the goods so consigned by the Edwin H. Fitler Company to the said agent under this agreement; this agreement to be in force until canceled by either party giving thirty days' notice of their desire to terminate the same, and at the termination of this contract by such notice or from any other cause, the above-named agent shall return any balance of goods, consigned as above and remaining unsold, to Philadelphia or any other point designated by the Edwin H. Fitler Company; and on the failure of the agent so to do, we the owners of the goods specified herein (or any other qualities that may be consigned by us to you as said agents) shall have the right to enter upon the premises of said agent and carry away such goods, without any interference on the part of the said agent. It is understood and agreed further that acceptance of this contract by both parties, herein mentioned, shall void any previous consignment agreements which may have existed between them.

Yours truly, The Edwin H. Fitler Co.

The Court adopted the following description of the course of dealing between the Fitler Company and the bankrupt.

. . . The Fitler items and all other items were entered together confusedly on the Menge books.

\* \* \* \* \* \*

The Fitler rope when sold was collected by Menge, and Fitler had nothing to do with collecting it. Fitler never knew to whom Menge had sold, nor on what items of credit. At the end of each month Menge would advise Fitler that it had made gross sales to a certain amount. Fitler would then bill Menge for the current market price of those gross sales.

\* \* \* \* \* \*

When Fitler shipped rope to Menge, it shipped the rope upon a request of Menge that he required a certain quantity of rope.

\* \* \* \* \* \*

When Menge received this rope, it sold it as it did other articles in its stock to whom it pleased and when it pleased on whatever terms it pleased. Fitler then looked exclusively to Menge for the collection of its account. The Menge Company never once rendered an account of individual sales to Fitler. It never once gave Fitler the names of the customers to whom the sales had been made. It never once gave Fitler the terms and conditions of its sales, nor was it ever called upon by Fitler to do so. When Menge sold Fitler rope, it billed that Fitler rope to its own trade and to its customers as though it were its own property. When Menge collected from its customers, its various accounts in which were included Fitler rope, the proceeds were deposited in the Menge general bank account, and it was used in meeting the expenses of Menge's current business. It was never kept in a separate bank account. Menge carried the insurance on this rope for its own account, and when Menge sold the rope, and suffered a loss on the sale, Menge suffered the loss. Menge sold the rope at whatever price it chose to sell it, and Menge's profit was the difference between what Menge sold the rope for, and what Fitler charged him for the rope. Menge was responsible for the safe custody and control of the rope, and Fitler had nothing to do with its control physically.

\* \* \* \* \* \*

142 La. at 667, 77 So. at 495.

■ When the actions of the parties in carrying out their understanding in this case are compared with the conduct of the parties in *Nelson,* the similarities are conspicuous. In both *Nelson* and this case (1) goods made available to the transferee for the purpose of sale remained the property of the transferor unless sold or otherwise disposed of by the transferee; (2) the transferor had the right to inspect the goods

while they were stored on the transferee's premises; (3) the transferee was not compensated by commission; (4) the transferee was permitted to determine to whom, at what price, and on what terms of credit it would sell the transferred goods; and (5) no distinction was drawn in the transferee's accounts between the portion of the proceeds of each sale that belonged to the transferee and the portion that belonged to the transferor. Moreover, to the extent that the parties before us behaved differently than did the parties in *Nelson,* the tendency is to make this an even clearer case for holding that a consignment existed. Central built and financed the truck stop and exercised complete control over the improvements and equipment that could be placed there, even to the extent of determining what color they could be painted. It had the power to restrain the Watsons' alienation of their property, and, through one of its affiliates, held a mortgage on both the truck stop and the land on which it was located. There is no indication that the Fitler Company, which the Louisiana Supreme Court held to be a consignor in *Nelson,* exercised anything even remotely resembling this breadth of control over its consignee's premises and operations.

There are, of course, some differences between the two cases. In *Nelson,* for example, the parties had entered into a detailed written agreement in which they repeatedly referred to their relation as a consignment, but no such agreement exists between Central and the Watsons. This difference, however, is unimportant. It has long been the rule in Louisiana that, in determining what relation exists between two parties, their actions speak louder than their words. *See, e. g., Winru Chemical & Sales Co. v. Collier,* 73 So.2d 9, 12 (La.App. 1964); *C. V. Hill & Co. v. Interstate Electric Co.,* 196 So. at 399; *accord Samson Tire & Rubber Co. v. Eggleston,* 45 F.2d 502, 504 (5th Cir. 1930), *cert. denied,* 284 U.S. 620, 52 S.Ct. 9, 76 L.Ed. 529 (1931). As the Louisiana Supreme Court stated in *Nelson,*

> In cases of this kind, the manner in which the parties carried out the contract, thereby interpreting it, tends to show what was its real character, what the parties really intended it should be.[8]

142 La. at 667, 77 So. at 495. Nor is there any reason why the absence of a description by the parties of the nature of their arrangement should incline us to define it as a sale rather than a consignment, or vice versa. The lack of a written agreement expressing the parties' conception of their relation simply decreases the data available to the court and enhances the significance of the parties' conduct as evidence of their intentions. A second difference between the two cases is that the price which Central charged the Watsons for each gallon of diesel fuel removed from the tanks was fixed in advance of the Watsons' sales to its customers, while in *Nelson* the court concluded that the Fitler-Menge contract did not establish a fixed price. We reject the notion that this furnishes a sufficient basis for distinguishing the two cases. Although the court in *Nelson* regarded the absence of a predetermined price as evidence confirming its view that the arrangement was not a sale, it by no means held that the presence of a price set in advance was inconsistent with the existence of a consignment.[9]

---

8. It is for this reason that we ascribe so little significance to the representations to be found in paragraph ten of the leaseback agreement. It provides:

> Nothing in this lease shall be construed as reverting to Central Oil any right to exercise any control over, or to direct in any respect the conduct or management of the business or operations of Lessees on the premises; but the entire control and direction of such business and operations shall be and remain in Lessees, subject only to Lessees' performance of the obligations of this lease. Neither Lessees nor any person performing any duties or engaged in any work on the premises or at the request of Lessees shall be deemed an employee or agent of Central Oil.

9. We cannot help but question the accuracy of the Louisiana Supreme Court's finding on this point. It is contrary to common sense to suggest that the Menge Company, whose solvency, as the Court acknowledged, depended upon its ability to maintain a difference between the price charged it by the Fitler Company and the price it charged its customers, neither knew nor had some means of calculating the price it

Central advances two arguments in its attempt to persuade us that it did not consign the diesel fuel to the Watsons and should not be held liable for the unpaid fuel tax. First, it asserts that its relation with the Watsons possesses many of the characteristics of a sale. In reply, we need only point out that the court in *Nelson* termed "insignificant" the characteristic on which Central relies most heavily—the fact that the Watsons were free to set their pump price as far above Central's price to them as they pleased. 142 La. at 670, 77 So. at 496. Second, Central contends that the excise tax on sales of diesel fuel for use in diesel-powered highway vehicles was not meant to be imposed on entities occupying its position in the distribution chain. It correctly points out that Congress intended to impose the tax on diesel fuel at the retail level (as contrasted with the tax on gasoline, which is imposed at the production level) [10]

. . . because substantially the same type of diesel fuel is also extensively used for heating in fuel-oil furnaces. Thus, it is impossible for the manufacturer to determine the ultimate use of the fuel at the time he sells it.

House Report No. 586, 82 Cong., 1st Sess. (1951), reprinted in [1951] U.S.Code Cong. & Admin.Serv., pp. 1781, 1825. But the argument falters because there is no evidence in the record to support Central's suggestion that, like most manufacturers, it is not in a position to determine whether the sales made by the Watsons are taxable. While it would be possible for the Watsons to make non-taxable sales, James Watson testified without contradiction that all of the diesel fuel dispensed by the truck stop during 1968–72 was pumped directly into the tanks of diesel-powered trucks. Central itself was deeply involved in the creation of a

truck filling station environment in which only taxable sales were likely to be made. Given Central's extensive control over the premises and the frequent visits of its representatives, it is highly improbable that the truck stop could make more than a *de minimis* amount of non-taxable sales without Central's knowledge. Therefore, the Congressional policy of imposing the excise tax on the sale of diesel fuel upon those who are in a position to know whether the sales made were taxable is not frustrated if consignors such as Central are held liable for the tax.

One collateral matter merits discussion. Nothing in the ruling we issue today is inconsistent with our decision in *Guidry v. Continental Oil Co.*, 350 F.2d 342 (5th Cir. 1965). *Guidry* was an action brought by a service station operator against his gasoline supplier under Section 1 of the Sherman Act, 15 U.S.C.A. § 1 (1973). He sought treble damages for injuries resulting in part from the defendant's alleged use of coercion on its retail outlets to enforce a system of resale-price maintenance. Because of the rule of *United States v. General Electric Co.*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), that the Sherman Act does not prohibit the use of resale price maintenance as part of a bona fide consignment distribution system, one of the issues before us in *Guidry* was whether the defendant had consigned its gasoline to the plaintiff. We fashioned an extremely narrow definition of consignment based on the common law, and held that both the conduct of the parties and the provisions of their contract indicated that the arrangement was a sale.[11] Since *Guidry* did not purport to apply Louisiana law, it does not control our ruling here.

---

would be charged by the Fitler Company before it made its sales. Moreover, the letter from Fitler to Menge indicates quite clearly that only the cost of the "*unsold stock* shall be subject to . . . market changes." 142 La. at 666, 77 So. at 494 (emphasis added.)

**10.** 26 U.S.C.A. §§ 4081 & 4082 (1967 & Supp. 1977).

**11.** Because we found that the service station operator in *Guidry* was not a consignee, we did not consider the impact of *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) on the *General Electric* rule.

The decision of the district court is AFFIRMED.[12]

---

12. In order to eliminate any possibility of doubt, we note that since we hold that Central made the taxable sales, the United States cannot recover any portion of the excise tax due from the Watsons and must refund to them the amount which they have already paid.