**Lee Roy GUIDRY, Appellant,**

v.

**CONTINENTAL OIL COMPANY,**
Appellee.

No. 21543.

United States Court of Appeals
Fifth Circuit.

July 2, 1965.

Rehearing Denied Aug. 17, 1965.

J. Minos Simon and Simon & Trice,
Lafayette, La., for appellant.

George Wear, Frank L. Merrill, Fort Worth, Tex., William W. Ogden, James D. Rives, of Ogden, Woods, Henriques & Rives, New Orleans, La., for appellee.

Before MARIS,[*] RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

This is an action for treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, arising out of the plaintiff's claims of resale-price maintenance in violation of the Sherman Act and of a "tying" agreement in violation of the Clayton Act. The plaintiff appeals from an order entered by the district court granting the defendant's motion for summary judgment and dismissing the plaintiff's action.

■ We view the evidence and the inferences therefrom in the light most favorable to the plaintiff to determine whether they are sufficient to show that there is no genuine issue as to any material fact concerning the plaintiff's claims.[1]

The complaint grows out of the refusal of Continental Oil Company to renew a service station lease and "Supplemental Bailment Agreement" for gasoline with the plaintiff. The "Supplemental Bailment Agreement" is terminable by either party "for cause" at any time and is cancelable by either party without cause upon twenty-four hours' written notice. Unless canceled or terminated, the Agreement's term was the term of the accompanying service station lease. The lease is for one year. The "Supplemental Bailment Agreement" and the lease were made on Continental's printed forms.

The plaintiff alleges that the lease was not renewed because the plaintiff would not comply with the demands of the defendant that he reduce his retail prices for gasoline. The plaintiff had given the district sales representative for Continental "a two-week trial at the prices he wanted, and at the time he wanted it." Some other service station operators in the Company who were asked to cut their prices changed their prices but some did not. The person who replaced the plaintiff and operated the service station formerly operated by him agreed to start selling gasoline at the reduced prices suggested by Continental's general sales representative and complied with this agreement for a short time.

Continental Oil Company sells Conoco branded gasoline in thirty states and the interstate character of the Company's business is undenied. Nor is it denied that the Company utilizes a substantial number of lease-type stations and dealer stations.

The plaintiff alleges that by a verbal agreement between the plaintiff and the Company, the plaintiff was not to handle or to sell any other products of the same line marketed or "sponsored" by the Company. However, in his testimony on oral deposition, the plaintiff admitted that he could sell "anything in the world" that he wanted to for cash or on his own credit. But the plaintiff could only charge Firestone and Goodrich tires and tubes on the Company's credit cards.

The district court concluded that the undisputed facts showed a simple unilateral refusal to deal by the defendant within the permissible bounds of United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. The district court deemed the complaint to be without substance and granted the defendant's motion for summary judgment.

■ A supplier may not use coercion on its retail outlets to achieve resale-price maintenance. The Colgate doctrine presumes that there is no agree-

---

[*] Of the Third Circuit, sitting by designation.

1. See Poller v. Columbia Broadcasting Sys., Inc., 1962, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458; United States v. Diebold, Inc., 1962, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176; Kilfoyle v. Wright, 5 Cir. 1962, 300 F.2d 626, 629; Fed.R. Civ.P. 56(c).

ment to maintain retail prices.[2] Here, agreements existed between two or more retail outlets in the same market. The coercive device in Continental's hands is its "Supplemental Bailment Agreement" and lease with its short-term and cancellation provisions which may be used effectively to terminate not only the plaintiff's gasoline supply, but his whole service station business.[3] Such devices promise to be equally, if not more, effective in maintaining gasoline prices than were the techniques in fixing monopoly prices on drugs in United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505.[4] On similar facts, the Supreme Court has recently held that resale-price maintenance through such a coercive type of agreement is illegal under the antitrust laws. Simpson v. Union Oil Co.[5] The agreement involved in that case was a short-term "consignment" agreement with cancellation provisions. Pursuant to the "consignment" agreement the company set the prices at which the retailer sold the gasoline. It is argued by Continental that Simpson is distinguishable since the "Supplemental Bailment Agreement" does not allow Continental to set the retail prices. We do not think this is a significant distinction. Although accomplished extraneous to the "Supplemental Bailment Agreement," a price agreement existed. Its existence is the

significant fact. However, the Court in Simpson reserved "the question whether, when all the facts are known, there may be any equities that would warrant only prospective application in damages suits of the rule governing price fixing by the 'consignment' device which we announce today." This reservation seemingly refers to the inequity to subjecting the Union Oil Company to a triple damage action for conduct that was apparently legal until the narrowing of United States v. General Elec. Co.,[6] 1926, 272 U.S. 476, 47 S.C. 192, 71 L.Ed. 362.

In General Elec. Co., the Court held that the ban on resale-price maintenance did not prohibit price fixing when used as part of a bona fide consignment distribution system. The consignment agreement involved the distribution of a patented product but the Court did not restrict its ruling to patented articles; it said that the use of the consignment device was available to the owners of articles "patented or otherwise."[7] Thus courts have consistently viewed agencies created by bona fide consignments as beyond the scope of section 1 of the Sherman Act.[8] But ever since the passage of the Sherman Act, the courts have consistently refused to permit the requirement of antitrust to be circumvented by the easy expedient of dressing a sale in the vestments of a sham agency agreement.[9] We do not deal with the

2. See Simpson v. Union Oil Co., 1964, 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98, 78 Harv.L.Rev. 279–782.
   A simple refusal to deal, standing alone, is not a vertical agreement; in fact the refusal indicates there has been a failure to obtain agreement. Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 686 (1962).

3. See Atlantic Ref. Co. v. FTC, 85 S.Ct. 1498, October Term, Nos. 292 & 296, decided June 1, 1965; Simpson v. Union Oil Co., 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98; Broussard v. Socony Mobil Oil Co., 5 Cir., 1965, 350 F.2d 346.

4. See Simpson v. Union Oil Co., 1964, 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98.

5. Id. at 24, 84 S.Ct. 1051.

6. See 78 Harv.L.Rev. 279, 282 (1964).

7. United States v. General Elec. Co., 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; See Simpson v. Union Oil Co., 1964, 377 U.S. 13, 23, 84 S.Ct. 1051, 12 L.Ed.2d 98.

8. See 78 Harv.L.Rev. 279, 281 (1964).

9. Handler, Recent Antitrust Developments —1964, 63 Mich.L.Rev. 59 (1964); see Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 31 S. Ct. 376, 55 L.Ed. 502; cf. Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 42 S.Ct. 360, 66 L. Ed. 653 (section 3 of Clayton Act).

question of prospective application of the rule announced in Simpson because of the nature of the "Supplemental Bailment Agreement" in the present action. By the terms of the "bailment," the plaintiff agreed "to hold and care for gasoline delivered hereunder without compensation as the property of Conoco." The plaintiff had

"* * * the option to purchase such stored gasoline from Conoco * * *. Bailee [the plaintiff] shall pay Conoco for all gasoline so purchased and withdrawn by Bailee upon invoice therefor submitted by Conoco * * *. All payments for the purchase price of said gasoline shall be at Conoco's dealer price, including all applicable federal, state and local excise taxes prevailing at the time and place of such purchase.

* * *

* * * * * *

"* * * Upon any cancellation or termination hereof, Bailee shall promptly (a) pay Conoco for all gasoline purchased and withdrawn from storage by Bailee and then unpaid for by Bailee; (b) deliver to Conoco consigned gasoline not so previously purchased by Bailee, or at Bailee's election, purchase for cash such consigned gasoline from Conoco at Conoco's then prevailing dealer price therefor at Bailee's location plus all applicable taxes."

While the purchase is effected when and as the Bailee delivers gasoline to his customers from the gasoline storage tanks, "title passing from Conoco to Bailee at the meters on the pumps," it is a title effectively passed. We find "in the contracts themselves and their operation plain provision for purchases by the so-called agents which necessarily made the contracts as to an indefinite amount of the consignments to them, contracts of sale rather than of agency." United States v. General Elec. Co., 1926, 272 U.S. 476, 487, 47 S.Ct. 192, 196, 71 L.Ed. 362; see Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502.[10]

Concerning the plaintiff's claim of a "tying" arrangement, we hold that the legality of the credit card limitations to Firestone and Goodrich tires should be determined only after a trial. We need to know more than we do about the actual impact of these credit-card arrangements on competition to decide whether the effect of these arrangements is to tie the sale of one product to a different product or preclude the purchase of that product from any other supplier, and to decide whether these arrangements have a "pernicious effect on competition and lack * * * any redeeming virtue," Northern Pacific Ry. Co. v. United States, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, and therefore violate the antitrust laws.[11]

The judgment of the district court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

10. In distinguishing bailments from sales, the test of a bailment is that the identical thing is to be returned in the same or in some altered form; if another thing of equal value is to be returned, the transaction is a sale. Black's Law Dictionary 185 (3d ed. 1933).

Since we have concluded that the supplemental agreement involved a sale, we do not reach the question of whether Simpson applies the per se rule against price fixing only to those consignment agreements involving a sufficient number of retail outlets to have a "quantitatively substantial" effect on competition, or whether the per se ban on price fixing applies to all agency price maintenance agreements involving two or more retail outlets within the same market since the evils associated with horizontal price fixing would be present. See 78 Harv.L.Rev. 279, 281 (1964).

11. See White Motor Co. v. United States, 1963, 372 U.S. 253, 263-264, 83 S.Ct. 696, 9 L.Ed.2d 738 (customer and territorial limitations). Compare Atlantic Ref. Co. v. FTC, 85 S.Ct. 1498, October Term, Nos. 292 & 296, decided June 1, 1965 (enjoined use of credit cards by Atlantic to sponsor or otherwise promote sale of sponsored products).