THOMAS A. CLARK, Circuit Judge,
dissenting:
I respectfully dissent. This court has recognized that “[i]n distinguishing bailments from sales, the test of a bailment is that the identical thing is to be returned in the same or in some altered form; if another thing of equal value is to be returned, the transaction is a sale.” Guidry v. Continental Oil Co., 350 F.2d 342, 345 n. 10 (5th Cir. 1965). Consideration of the contract at issue and the authority relied on by the majority leads me to the conclusion that this transaction was a contract to sell goods at a future time and not a bailment. Since this type of agreement amounts to a “contract for sale” under § 2 106(1) of the Uniform Commercial Code, Ala.Code § 7-2-106(1), this court’s holding in In re Samuels & Co., 526 F.2d 1238 (5th Cir. 1976) (en banc), gives the C.I.T. Corporation sufficient right in the film waste under Alabama law so that its security interest attached and was superior to Eastman Kodak’s unperfected interest in the goods. Therefore, I would affirm the district court’s judgment for the C.I.T. Corporation on the ground that the transaction at issue here was a sale, and accordingly Samuels controls our disposition of this appeal.
With one important exception, I agree with the majority’s statement of facts in this case. The majority states that in the contract between Eastman Kodak (hereinafter referred to as “Kodak”) and Sitkin, the latter “agreed to process a minimum of 500,000 pounds of print film waste and purchase the silver content recovered upon processing.” Ante, at 1214 (emphasis added). I disagree. While the silver content in the film waste was without question the sole reason these companies entered into this agreement, I think the majority has incorrectly identified the goods being sold. The goods to be sold by Kodak to Sitkin were the 500,000 pounds of film waste which contained recoverable silver. There was no sale or purchase of just the silver content in the film waste. The silver content in the film waste, which could only be salvaged upon processing, was to serve only as a pricing mechanism for the sale of the 500,000 pounds of film waste. This is readily apparent from the contract itself which, because of its importance to an understanding of this case, I set forth in its entirety:

*1219

*1220

From its reading of the contract above and consideration of the circumstances surrounding this transaction, the majority concludes that, although it is a “close question,” Sitkin’s possession of the unprocessed film waste was a bailment under Alabama law. In so holding, the majority relies primarily on NYTCO Services, Inc. v. Wilson, 351 So.2d 875 (Ala.1977), and In re Medomak Canning Co., 25 U.C.C.Rep.Serv. 437 (D.Me.1978). I have reviewed the Kodak-Sitkin contract in light of those two cases. Unlike the majority, however, my conclusion is that NYTCO and Medomak require a holding here that the film waste was not being held by Sitkin as a bailee.
In NYTCO Services, Inc. v. Wilson, the Supreme Court of Alabama considered the bailment or sale question in the context of soybeans that were being stored in a grain warehouse. NYTCO Services was a New York warehousing firm that was engaged *1221 in the business of storing farmers’ agricultural products in storage bins. As part of its business, NYTCO leased the Covington Grain storage facilities in Andalusia, Alabama. During the 1974 harvest season, local farmers had delivered soybeans to the Covington grain storage facility under a type of agreement which provided “for a price to be agreed upon later.” 351 So.2d at 877. Under the agreement the farmer,
after delivering his soybeans to Coving-ton Grain, could purchase an equivalent quantity of soybeans with a five cents per bushel handling charge plus a one and a half cent per bushel per month storage charge. The receipts most farmers received for their deliveries were various Covington Grain weight tickets; however, some received Covington Grain statement sheets. The weight tickets had the words “Bought of” printed on them together with the name of the farmer and some had the word “Hold” written on them. A number of the statement sheets had the words “Store,” “Stored,” or “On Storage” written on them together with the name of the farmer.

Id.

The majority reasons that in NYTCO the Supreme Court of Alabama found a bailment instead of a sale for two principal reasons: (1) the farmers had the option to require the grain storage company to either return the grain or sell it; and, (2) the evidence indicated that the soybeans were being stored by the company on the farmers’ behalf.
Unlike the majority, I do not find either element present in the Kodak-Sitkin transaction. My brothers suggest that Kodak had “the option under the contract to have the film waste returned or processed.” Ante, at 1217. However, as the contract itself reveals, Kodak only had such an “option” if the contract were terminated by either Kodak or Sitkin. Any right Kodak may have had to cancel the contract was extinguished when the waste was processed. The majority suggests this “makes no difference” because “[a] bailment may still exist where the bailee has a continuing option to purchase or to sell.” Id. at 1217. However, under the terms of the contract, Sitkin as the purported bailee was given no “continuing option to purchase or to sell.” Sitkin was required by the contract to purchase the film waste, process it, and pay Kodak. Sitkin certainly had no option to decide whether to process the waste and it was not given the liberty to sell the waste without processing it first.
Examining the second factor in NYTCO the majority concludes that several aspects of the Kodak-Sitkin arrangement evidenced a bailment instead of a sale. First the majority finds support for a bailment in Sitkin’s agreement to assume responsibility for the waste by picking it up at Kodak’s facility in New York and transporting it to warehouses in Alabama that Sitkin had leased. I fail to see how this aspect of the transaction indicates a bailment. The film waste apparently had little if any value to Kodak due to its inferior quality. Sitkin approached Kodak and offered to turn what was to Kodak a virtually worthless commodity into a saleable commodity from which both parties could benefit financially. Sitkin was in the business of purchasing industrial waste, transporting the waste to its own processing facilities and salvaging valuable metals from what was unusable, unmarketable junk to the sellers. Sitkin’s acceptance of the goods in New York is just as consistent with a sales transaction as it may be with a bailment.
The majority also notes that the film waste had Kodak’s name on it, was tagged as Kodak property, and was stored in Sit-kin’s warehouses in the original Kodak shipping cartons. To me these facts do not support a finding of bailment. Certainly it was more practical for Sitkin to transport and store the inferior film in its original packaging and shipping cartons. There would be no reason for Sitkin to assume the added expense and trouble of removing the film from its cartons and crossing out Kodak’s brand name before the company began the salvaging process.
*1222 Furthermore, the company’s accounting treatment for this transaction is totally consistent with a future sale of the film waste. For the reasons that the film waste was of no value to either party in its unprocessed state and that the sales price could only be determined by the pricing formula once the waste was processed, Kodak probably could not legally carry the waste on its books as a receivable.
In re Medomak Canning Co., supra, is considered by the majority to be “an analogous case finding a bailment.” Ante, at 1217. In the Medomak case, a large food concern, William Underwood Co., did not want to produce baked beans itself. Underwood wanted to acquire finished pork and beans products from other sources. The food company entered an agreement with Medomak under which Medomak essentially would process and package the pork and beans. Underwood would purchase the food ingredients and the packaging and shipping supplies and then have them delivered to Medomak. Medomak would process the food, can it, and then ship the furnished product to locations designated by Underwood. In the court’s words, it considered itself presented with “an entrusting of possession of goods to be transformed by processing or manufacture for return to the entruster or its consignees." 25 U.C.C.Rep.Serv. at 445 (emphasis added). The court concluded that “the parties contemplated merely that Medomak would process the goods entrusted to it by Underwood for later sale by Underwood to its own customers.” Id. at 448 (emphasis in original).
The holding of the court in In re Medomak Canning that the processing transaction was a bailment is perfectly reasonable. The parties there clearly intended that Me-domak simply receive the goods which were bought and owned by Underwood, process them, and return them to Underwood. But those circumstances which support a finding of bailment are just not present in this case. Neither Kodak nor Sitkin intended that Sitkin process the film waste and return either it or the silver content to Kodak. The only item Kodak wanted to receive from Sitkin was cash. The intent of the transaction was that the goods would be destroyed by Sitkin. There was no resale of the film waste envisioned by either Sit-kin or Kodak.
Noting the Medomak court’s emphasis on the fact that the parties there intended a bailment because “no purchase price was ever agreed upon in respect to those ingredients and other materials which were never processed,” 25 U.C.C.Rep.Serv. at 447 (emphasis in original), the majority suggests that the Kodak-Sitkin contract reproduced above “did not set a purchase price for the film waste prior to its processing.” Ante, at 1217. While Kodak and Sitkin did not specify an exact dollar amount at the time of contracting, the parties did agree to a reasonable and enforceable price calculating formula based on two factors: (1) the quantity of silver recovered from the film waste; and, (2) the market value of silver during the thirty day settlement period. There is no requirement in Article 2 of the Code that a certain dollar price be stated in the contract in order for there to be a sale. Clearly, this is not a contract in which the parties failed to agree on a price for their goods. Such an “open price” situation would be governed by Ala.Code §§ 7-2-204 and 7-2-305. Kodak and Sitkin clearly agreed to a specific price setting formula. Thus, I consider the majority’s reliance on the decision in Medomak to be misplaced.
Therefore, I conclude that the transaction at issue amounted to a contract for sale of the film waste. I acknowledge that in the contract Kodak sought to reserve title to the goods by providing that “[ojwnership or claim to the material ceases upon destruction or change of identity.” In my view this provision evidenced the parties’ intent to engage in a future sale of the goods. Kodak argues that the parties really intended two transactions from their one contract. First, Kodak contends that they agreed to a bailment. Second, according to Kodak, they also agreed to a future sale of future goods. Kodak convinced the majority that the goods being sold here were the silver *1223 ash “which had not yet come into existence” at the time of contracting. (Appellant’s reply brief at 12.) This is belied by the contract. As noted at the outset, the goods being sold here were the 500,000 pounds of film waste. Ala.Code § 7-2-105 specifies that “[g]oods which are not both existing and identified are ‘future’ goods.” Obviously, the film waste was “existing” at the time of contracting and clearly, as the film waste already had been delivered to Sitkin, the goods had been identified to the contract within the meaning of UCC § 2-501, Ala.Code § 7-2-501. Whether we choose to consider the contract for sale to be a present sale or a future sale is not important, however. Under Article 2 of the Code, both types of sales are permissible and are treated similarly.
Ala.Code § 7-2-106 provides in pertinent part:
“Contract for sale” includes both a present sale of goods and a contract to sell goods at a future time. A “sale” consists in the passing of title from the seller to the buyer for a price (section 7-2-401).
Furthermore, as Official Comment 1 to § 2-106 explains, “the rights of the parties do not vary according to whether the transaction is a present sale or a contract to sell unless the Article expressly so provides.” Under Ala.Code § 7-2-103(l)(d), a seller is defined as “a person who sells or contracts to sell goods.” Kodak’s role in this transaction falls within this definition.
Thus, Eastman Kodak as a seller of the goods sought to reserve title to the goods until such time as they underwent the silver salvaging process. UCC § 2 -401 speaks directly to an effort by a seller to reserve title to goods:
(1)Title to goods cannot pass under a contract for sale prior to their identification to the contract (section 7- 2 501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.
Ala.Code § 7 2 401(1) (emphasis added). Therefore, under the logically related provisions of the Code, Kodak as a seller had only a security interest in the goods which it admittedly failed to perfect.
Because the majority has decided to view this contract as a bailment-sale hybrid transaction, my brothers chose to apply Ala. Code § 7-2 403(2) to this case. However, since I consider this transaction to be an Article 2 contract for sale, I submit that instead we should apply subsection (1) of § 2-403 to this case. Ala.Code § 7-2-403 provides in pertinent part:
(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:
(a) The transferor was deceived as to the identity of the purchaser, or
(b) The delivery was in exchange for a check which is later dishonored, or
(c) It was agreed that the transaction was to be a “cash sale,” or
(d) The delivery was procured through fraud punishable as larcenous under the criminal law.
(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
(3) “Entrusting” includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor’s disposition of the goods have been such as to be larcenous under the criminal law.

*1224 It is undisputed that at all times during the Kodak-Sitkin transaction C.I.T. had a perfected security interest in all of Sitkin’s inventory, including after-acquired inventory. As the majority acknowledges, this court, sitting en banc, held in In re Samuels & Co., 526 F.2d 1238 (5th Cir. 1976), that a secured creditor such as C.I.T. may be a good faith purchaser within the meaning of § 2-403(1), and thus its perfected security interest would be superior to the unperfect-ed security interest of the original seller of the goods. The majority here states that § 2-403(1) applies only “where the bankrupt was a purchaser of the goods in question.” Ante, at 1215. Because I consider Sitkin a “purchaser” of the film waste from Kodak, I would hold that under Samuels, C.I.T. is a good faith purchaser within the meaning of § 2-403(1) and its perfected security interest would give it title to the film waste as against Kodak, the unperfected seller of the goods to the bankrupt Sitkin.
For these reasons, I would affirm the district court’s judgment for the C.I.T. Corporation.