**FARM STORES, INC.,**
Plaintiff-Appellee,

v.

**TEXACO, INC., Defendant-Appellant.**

No. 84–5070.

United States Court of Appeals,
Eleventh Circuit.

June 24, 1985.

Bruce C. Bailey, Houston, Tex., Smathers & Thompson, David Batchelor, Miami, Fla., G. Kenneth Handley, White Plains, N.Y., for defendant-appellant.

Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., Curtis Carlson, Miami, Fla., for plaintiff-appellee.

Before RONEY and TJOFLAT, Circuit Judges, and BROWN *, Senior Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge:

## I. *Nature of the Action*

Farm Stores, Inc. instituted this action against Texaco, Inc. alleging that Texaco's failure to renew a contract between the parties violated the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801, *et seq.* Farm Stores claimed that its relationship with Texaco constituted a franchise, thereby bringing the parties' contract under the protection of the PMPA. Specifically, Farm Stores contended that Texaco's notice of nonrenewal of the contract was a violation of § 2804, the notice requirement provision of the PMPA. Under § 2804 there are restrictions which limit a petroleum franchisor's ability to terminate a franchise.

The district court denied Texaco's counterclaim for ejectment and, employing the test of entreprenurial responsibility from *Simpson v. Union Oil*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), found that Farm Stores was constructively covered by the PMPA and granted its claims for declaratory and injunctive relief, 577 F.Supp. 682.

After thorough examination of the statute, the legislative history of the PMPA, the prior case law, and the record, we reverse the district court's decision. In Part II of this opinion we examine the parties and their contractual relationship. In Part III we consider the legislative history of the PMPA. Part IV analyzes this case under the appropriate and controlling legal standards of this circuit. Part V concludes that Farm Stores is not protected by the PMPA, either expressly or constructively.

## II. *Case History*

### (a) *The Parties*

Farm Stores is a Florida corporation with its principal place of business in Dade County, Florida. Farm Stores operates approximately 265 convenience stores (and related facilities) which sell grocery and dairy products throughout the state of Florida. Approximately 90 of these facilities are used to market both food products and motor fuel. In some of the locations Farm Stores sells fuel under its own private label rather than the brand of a major oil company.

Texaco is an integrated oil company with worldwide operations. In Florida, Texaco has two types of operations: (1) retail outlets operated by conventional retailers/dealers, who, Texaco concedes, fall within the parameters of the PMPA; and (2) retail outlets operated by contract operators. Texaco contends these contract operators are not protected by the PMPA. Texaco maintains that Farm Stores is such a contract operator.[1]

---

* Honorable John R. Brown, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Albert L. Derden, manager of the Texaco Orlando division, when called by Farm Stores, testified as to the different types of operations used by Texaco to sell fuel:

   Q. What different forms of marketing does Texaco have at the retail level?

   A. There are four different ways that we can market. One is on a lessee-retailer basis, which is the backbone of our business. I would say approximately 95 percent or more of our business is on a retail level or through independent retailer operators.

   We also have what we refer to as contract retailers. Those are retailers who own their own facilities, own their own land, have control of their property and only have a supply agreement with us.

   We also can have a salaried operation or we can have a contract operation, as we have here.

   *    *    *    *    *    *

   If a retailer is a retailer, it's immaterial as to what facility he's operating, but a retailer is an independent businessman. He controls and has total, 100 percent jurisdiction over all of the marketing policies associated with the business he conducts upon the property, which he leases from a supplier.

### (b) *The Contractual Relationship*

Texaco has owned the station site at issue since 1962. The raw land has a market value of $400,000. In 1982 Texaco built a "System 2000" self-service gasoline outlet on the property which cost approximately $500,000. The System 2000 also included a miniature convenience store and carwash.

During construction of the facility, Texaco considered various alternatives for its operation. Testimony revealed that Farm Stores had long sought to operate a facility on the site. However, in the spring of 1982, prior to entering any contractual relationship with a party to operate the System 2000, Texaco advised Farm Stores—in response to Farm Stores' inquiry—that it was negotiating a contract with the Southland Corp., the owner of the 7–11 convenience store chain.

Farm Stores' vice-president, Richard E. King, responded to this news by inquiring whether there was "anything Farm Stores could do" to obtain the location instead of Southland. Texaco informed Farm Stores that the only way to stop the Southland contract from being finalized was for Farm Stores to agree to Texaco's contract terms "as written." In its preliminary discussions with Texaco, Farm Stores had sought to negotiate a contract with a minimum life of three years. However, the contract Farm Stores agreed to sign to secure the location over a major competitor provided for a one-year term with renewals unless terminated by either party after giving notice.[2] Given Farm Stores willingness to accept the contract as written, Texaco awarded Farm Stores the location in August of 1982.[3]

Under the contract Texaco assumed responsibility for structural maintenance, kept title to all gasoline products, and agreed to pay Farm Stores a certain fixed amount per hour to operate the station—regardless of whether any gasoline was sold. For its part, Farm Stores agreed to perform routine maintenance, hire suitable em-

> He has the 100 percent, total financial risk. His monies are invested in all inventories which he sells. The products which he sells he actually purchases and he is invoiced for those.
> He determines his income solely within his judgment, based upon what he pays for the products that he has in inventory and appointed prices, which he depicts, which he wishes to market those to the motoring public.
> He carries all credit for all sales that he makes at his facility, with the exception of the sales that he may make and utilize the benefits of the Texaco credit card.
> However, if he does use that credit card, we do charge him a three percent processing fee for that.
> He purchases all licenses and controls all licenses, as far as the operation of his business, including his dealer-retailer license. In comparison, from a contractor's standpoint, a contractor is not an independent retailer of petroleum products. He does not own any of the petroleum products being sold through the dispensing units on the property.
> He does not have a—he does not—he is never invoiced for any product going through the dispensers. He does not set any prices at the location and he does not determine the marketing policies relative to the marketing of gasoline at the facility.

> He does not determine the hours of operation, nor does he determine the days that he's open. Nor does he determine the price.
> The contractor functions solely as an independent operator, independent operator as far as the grocery sales, and is paid a fee by Texaco on an hourly basis for administrative labor services in collection of monies generated from sale of products that we own and hold title to.

2. Specifically, the contract provided:
> The term of this Contract shall commence on the Effective Date and shall continue for a period of one (1) year thereafter, and shall be automatically extended for like terms unless either party terminates the Contract upon written notice to the other party ninety (90) days prior to the expiration date of the original term or any extension thereof. The Effective Date will be agreed to by the parties and evidenced by a letter.

3. Of course, this whole case could have been avoided because the PMPA makes provision for a trial franchise when the parties are just entering into a relationship with each other. The simplified termination rights under 15 U.S.C. § 2803 are not at issue here because Texaco's agreement did not meet the requisites of the statute. Additionally, the issue was not before the district court.

ployees to run the store, and collect the self-service gasoline proceeds.[4] Farm Stores received a fixed payment per hour for the station's operation and was allowed to keep all proceeds from the food and carwash sales. In return, Farm Stores agreed to pay the cost of utilities for the station's operation. The contract identified nothing as a lease agreement, nor was a rent specified.

The issue before the district court, now presented to us for review, is whether the contractual relationship between Texaco and Farm Stores is of the type Congress intended to protect with the PMPA. At trial Farm Stores argued that where the applicability of a congressional statute depends upon imprecise language in a contract, all ambiguities or doubts should be resolved against the draftsman. This is as accurate a statement of contractual interpretation as it is inapposite. We find that the language of the contract was clear. In fact, the first page of the contract states:

NO FRANCHISE. CONTRACTOR ACKNOWLEDGES THAT THIS CONTRACT DOES NOT CREATE, EXTEND, OR RENEW A FRANCHISE UNDER ANY LOCAL, STATE OR FEDERAL LAW, INCLUDING THE FEDERAL PETROLEUM MARKETING PRACTICES ACT. CONTRACTOR FURTHER ACKNOWLEDGES THAT THIS CONTRACT WITH TEXACO IS A SEPARATE AND DISTINCT CONTRACT FROM ANY OTHER AGREEMENTS, CONTRACTS, OR FRANCHISE RELATIONSHIPS WHICH MAY NOW OR HEREAFTER EXIST BETWEEN TEXACO AND CONTRACTOR.

While such a boldface statement alone is inconclusive, the contract between Texaco and Farm Stores clearly enumerates each party's obligations and these are consistent with the statement that Farm Stores is not a franchisee. The contract established a relationship which, by its own unambiguous terms, was to last for one-year periods until either party exercised its option to terminate the relationship.

As we perceive it, the question in this case involves whether Congress intended the PMPA—a complex remedial statute—to be applied to a clearly written contract which Farm Stores chose voluntarily to accept on an "as is" basis to keep a competi-

---

4. Farm Stores' expert witness, Jack Winfred Houston, testified that the convenience store had two cash registers. One was used exclusively to hold gasoline sales; the other exclusively for food sales. Thus, when collected, all funds were physically segregated. They were comingled only at the end of each business day when transported by armored car. At the end of each day Farm Stores paid Texaco by check for all fuel sales.

Q. Did you see, from what you observed anything inconsistent with the functions that Farm Stores accepted to do under the contract as it regards the collection of the proceeds for the delivery of products and the delivery of these proceeds to Texaco?

A. The only inconsistency with the normal retail operation that I observed was that there was a second cash register in which the recording transaction was placed into that equipment as a separate accounting for gasoline movement.

Q. Were those funds segregated?

A. The funds, Your Honor, as I observed, were, in fact, segregated, but then I was shown how they were combined by report form and by deposit form to be transmitted on to the bank in one sum.

THE COURT: By check?

THE WITNESS: Transferred to the bank, Your Honor, to be deposited in an account, and I was told—I did not observe any check, but I was told, in response to the question, "How do you pay Texaco"—it was that a separate check paid out of a separate account, which later the money is transferred into that account, but it may not be the same monies at all reaching the Texaco company.

BY MR. BATCHELLER:

* * * * * *

THE COURT: One last question and then I will come back to you again, Mr. Batcheller. If a customer comes in to this particular store on Red Road and pumps some gas and buys some groceries, does the payment, if it is in cash, for both go in the same cash register?

THE WITNESS: No, it does not, Your Honor. It is segregated.

THE COURT: Two separate cash registers?

THE WITNESS: Yes.

THE COURT: One for the gasoline product and the other for the grocery product?

THE WITNESS: Yes, sir.

tor from securing a particularly valuable business location.

### III. *The Petroleum Marketing Practices Act (PMPA)*

In 1978 Congress enacted the PMPA to govern the termination of franchise relationships for the sale of motor fuel. The PMPA was passed to alleviate concern that franchise dealers could be subjected to unfair treatment by the supplier of their principal sales item, motor fuel. Specifically, it was designed to protect against the arbitrary or discriminatory termination or nonrenewal of a motor fuel franchise. Congress, at the same time, sought to preserve the flexibility needed for franchisors to initiate changes to respond to shifting market conditions and consumer preferences. As the legislative history makes clear:

> The franchise relationship in the petroleum industry is unusual, in fact perhaps unique, in that the franchisor commonly not only grants a trademark license but often controls, and leases to the franchisee, the real estate premises used by the franchisee. In addition the franchisor almost always is the primary, even exclusive, supplier of the franchisee's principal sale item: motor fuel. This relationship is, therefore, often complex and characterized by at times competing interests.

> \* \* \* \* \* \*

> Central to the problems faced by franchisees in this regard is the disparity of bargaining power which exists between the franchisor and the franchisee. This disparity results in franchise agreements which some franchisees have argued amount to contracts of adhesion. The provisions of the contracts between the franchisor and the franchisee and the permeating influence of these contracts over nearly every major aspect of the franchisee's business may translate the original disparity in bargaining power into continuing vulnerability of the franchisee to the demands and actions of the franchisor.

> It is important to note that while the relationship of the parties to a motor fuel franchise agreement is basically contractual in nature, normal remedies for violations of the contractual provisions are often eschewed by the franchisor. The disparity of bargaining power which disadvantages the franchisee in negotiations leading to the execution of the franchise agreement manifests itself in the contractually provided remedies for contract violations or changes in circumstances. Commonly the franchisor is able to capitalize on his disparity in bargaining power to obtain greater flexibility with respect to his rights to terminate the contractual relationship. As a result, termination of franchise agreements during the term as a remedy for contract violations has been repeatedly utilized.

> \* \* \* \* \* \*

> It is also important to note that often the reasonable expectations of the parties to a motor fuel franchise are that the relationship will be a continuing one. This expectation by the franchisee, in particular, is often the result of, and fostered by, statements and actions of the franchisor. As a result, non-renewal of a motor fuel franchise relationship at the expiration of its term can be almost as punitive as termination of the franchise during its term. The reasonable expectations of the franchisee, rather than any definitive contract rights, are destroyed.

S.Rep. No. 731, 95th Cong. 2d Sess. 17, reprinted in 1978 U.S.Code Cong. and Ad. News 873, 875. *See, Brach v. Amoco Oil,* 677 F.2d 1213, 1216 (7th Cir.1982).

The PMPA, therefore, was drafted so as to prohibit the termination or nonrenewal of a franchise unless that termination or nonrenewal is based on one of the permissible reasons set forth in § 2802 and given in compliance with the procedural notice requirements set forth in § 2804.

■ Crucial to an understanding of this case, however, is the realization that Congress intended the PMPA to apply only to the franchise relationship between a "refiner," "distributor," or "retailer" of motor

fuels under a brand name. Unless the parties meet the statutory definition of one of these terms, there is no coverage under the PMPA and general contractual principles govern. The statute defines a "franchise" as:

(i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

(ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed—

(I) under a trademark owned or controlled by a refiner[.]

15 U.S.C. § 2801(1)(B)(i) and (ii).

The definition of a "refiner" is not relevant in this case, but the statutory definitions of a "distributor" and a "retailer" are the starting point of our analysis.

(6) The term "distributor" means any person, including any affiliate of such person, who—

(A) purchases motor fuel for sale, consignment, or distribution to another, or;

(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for such supplier.

(7) The term "retailer" means any person who purchases motor fuel for sale to the general public for ultimate consumption.

15 U.S.C. § 2801(6) and (7).

IV. *Farm Stores does not fit within the Statutory Language of the PMPA*

■ Since the parties' contract clearly states that no franchise relationship was created, Farm Stores has the burden of showing that the otherwise clear contract is governed by the PMPA. It is our conclusion that the district court erred in holding that Farm Stores satisfied that burden. Although on this appeal we are bound by the district court's findings of fact unless they are clearly erroneous, see F.R.Civ.P. 52(a), the clearly erroneous standard does not apply to legal conclusions or mixed questions of law and fact. *Pullman-Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); see, 5A Moore's Federal Practice ¶ 52.05[1].

The PMPA is a complex remedial statute designed by Congress to deal with the threat of overreaching by franchisors. As such, the PMPA impinges upon the freedom to contract because parties coming within its scope have their discretion curtailed when it is legislatively determined that they lack equal bargaining power.

The district court, by ruling that Farm Stores was a *purchaser* of motor fuel, made it fit the definition of a "retailer" or "distributor" and accordingly, come within the protective termination provisions of the PMPA. We now examine the district court's conclusion that Farm Stores purchased gasoline.

(a) *Farm Stores was not a Purchaser of Gasoline*

The relevant facts found by the district court clearly show that Farm Stores was not a purchaser of gasoline. Farm Stores did *not:* (i) pay for the gasoline inventory until it was sold; (ii) take title; (iii) pay ad valorem taxes on the gasoline inventory; (iv) bear the risk of loss of the gasoline (except for its own carelessness); (v) retain any funds from the sale of the gasoline to motorists; (vi) set the price or assume the market risk in fluctuations in gasoline prices; (vii) pay sales taxes or extend credit to motorists on resale; and (viii) hold a gasoline retailers business license.

It seems obvious to us that the consumer is the purchaser of gasoline. At oral argument Farm Stores relied heavily on *Guidry v. Continental Oil Co.*, 350 F.2d 342 (5th

Cir.1965), for the proposition that title passed from Texaco to Farm Stores when the gasoline was pumped from Texaco's tanks through the meters into the customer's tanks. However, *Guidry* involved a service station operator's antitrust claims of illegal resale price maintenance and tying arrangements. *Guidry* is easily distinguished from the present action because it was undisputed that Guidry leased the station as a franchisee. Thus, in addition to being a resale price maintenance case under the antitrust laws rather than a PMPA case, the parties contractual relationship in *Guidry*, unlike the case before us, was never an issue. We decline to creatively employ *Guidry* to characterize Farm Stores as serving a wholesale function.

Farm Stores contends that it is a "distributor" because it "receives motor fuel on consignment for ... distribution to ... [its] own motor fuel accounts or to the accounts of ... [its] supplier...." (Section 2801(6)(B).) We cannot see that Farm Stores can be characterized as a distributor because the public purchases motor fuel at this location for consumption and the dis-

tributor definition involves consignment which applies only to wholesale operations. In *Johnson v. Mobil Oil Corp.*, 553 F.Supp. 195 (S.D.N.Y.1982), the court stated:

> The legislative history makes clear that in defining a "distributor" who operates under a consignment Congress had in mind an independent middleman acting as a jobber, *not a dealer selling to the public at retail.*[5]

*Id.* at 198. (emphasis added)

The facts do not support the requisites, as a matter of law, to establish a consignment. The motor fuel remained at all times Texaco's. It is deposited by Texaco from Texaco's trucks into Texaco's tanks; it passes through Texaco's equipment, and is sold directly to retail customers who pump the gasoline themselves and pay cash or use a Texaco charge card. The only intervention of Farm Stores in the entire process is that the motorist pays his money or gives his charge ticket to a Farm Stores employee. The contract between Texaco and Farm Stores clearly contemplated the contractual relationship of principal and agent, not franchisor and franchisee.

---

**5.** "The term 'distributor' is defined broadly to include both marketers who purchase motor fuel for distribution and those who receive motor fuel on consignment for distribution to their own motor fuel accounts or to those of their supplier.

It is the intention of the committee to include consignees under the definition of "distributor" without regard to whether the accounts they serve are those of the supplier or those of the consignee. However, the committee also intends to exclude from the definition of a consignee one who is only an employee of the supplier or who merely provides transportation service for the supplier." S.Rep. No. 731, 95th Cong.2d Sess. 30, reprinted in 1978 U.S.Code Cong. and Ad.News 873, 888.

Two cases have considered the plain language of the PMPA and the legislative history in determining its application in similar situations. In *Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5 (2d Cir.1982), *cert. denied*, 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 73 (1982), the court considered whether a broker, who obtained retail and distributor outlets for Amoco Oil Co., was itself a franchisee covered by the PMPA. The court found that the broker was clearly not covered by the plain language of the statute. The court also examined the legislative history and found that Congress had not meant to include the broker under the protection of the

PMPA. The court considered the legislative history of the definition of "distributor" as it related to a consignee. The court found no congressional intent expressed beyond that clearly stated in the language of the statute. *Id.* at 8. We believe Farm Stores stands in exactly the same position as the broker in *Checkrite.* Farm Stores, broadly speaking, claims to be "marketing" branded fuels, but Farm Stores does not come within the specific language of the PMPA.

In *Johnson v. Mobil Oil Corp.,* 553 F.Supp. 195 (S.D.N.Y.1982), the plaintiff operated a Mobil full service gasoline station for over ten years before Mobil notified him of its intention to terminate their relationship. Johnson sought an injunction under the PMPA. The court found that the PMPA did not apply. The court looked to the statutory definitions to determine the scope of statutory coverage, and found that in using the definition of a "distributor" as including persons receiving motor fuel on consignment, "Congress had in mind an independent middleman acting as a jobber, not a dealer selling to the public at retail." *Id.* at 198. *See* also *Checkrite Petroleum, supra,* at 8. Similarly, Farm Stores' operation of a grocery store fails to come within the express language of the PMPA since it acts as neither a retailer nor a distributor of motor fuel.

Farm Stores seeks to rely on the district court's "finding" that it was a "purchaser" of motor fuel, and therefore came within the purview of the PMPA. This determination, however, is a legal conclusion and is subject to our plenary review. We hold that the district court erred because its own fact-findings reveal that Farm Stores did not meet the statutory definitions of "retailer" or "distributor" under the PMPA because Farm Stores never purchased any motor fuel from Texaco.

### (b) The Franchise Relationship Under the PMPA

In the portion of its opinion concluding that the relationship between Texaco and Farm Stores was the type of franchise relationship Congress intended to protect, the district court looked to the indicia of independence exhibited by Farm Stores. To support its conclusion that Farm Stores was a franchisee, the district court decided that Farm Stores leased the gas station site from Texaco despite the lack of a formal lease. The district court upheld Farm Stores' contention that its payment of the facility's monthly utilities constituted rent for occupying the gasoline station, carwash, and convenience store. The utilities, as the evidence showed, amounted to approximately $2,000 per month. Texaco's division manager in charge of marketing for the state of Florida testified that Texaco would charge between $6,000 and $7,000 per month if it had leased the entire facility. It is therefore apparent, that although Farm Stores was responsible for payment of the utilities covering the entire site, if this payment was going to be considered rent, it would serve only as rent in ex-

change for use of the convenience store and carwash.[6]

Farm Stores argued creatively on appeal that the remainder of Texaco's rent was derived from the profit spread it made on selling gasoline at full retail price. This argument, properly considered, does not aid Farm Stores. It would require us to presuppose that Farm Stores purchased the fuel wholesale, then sold it retail to the customer. But unlike this typical franchisee situation, Farm Stores did not purchase any fuel from Texaco; it only remitted funds to Texaco as the fuel was sold. In essence, Farm Stores argues that the spread received by Texaco between its wholesale and retail price constituted Farm Stores' rent of the station site from Texaco; Farm Stores makes this contention despite the absence of liability for the fuel until it was sold—in order to be a purchaser protected by the PMPA. In the absence of any liability for fuel, we decline to elevate Farm Stores collecting the spread between the wholesale and retail price charged by Texaco to other retailers into a purchase or rent. The fuel remained at all times Texaco's. Farm Stores merely collected the funds generated by the price Texaco posted. Farm Stores' obligation would have been exactly the same under the contract regardless of the posted price. But most importantly, Farm Stores was not responsible for setting the fuel price, nor was it carrying the gasoline inventory and dependent upon its sale to pay obligations to Texaco.

However, even if we accept the district court's conclusion that payment of the utili-

---

**6.** As was indicated in the trial testimony of David L. Derden, Texaco's division manager for the Florida Region: In the case of Farm Stores, they pay the utilities, but they do not pay us a flat rental.

    Q. So, what you are saying is payment of utilities is the same as payment of rent?

    A. I'm saying that we negotiated with Farm Stores. At the time that we entered into a contract, we initially approached them on collecting a four to five or six percent of the gross sales through the c-stores [convenience stores], give them the right to operate the c-store.

They came to us and requested that that created a difficulty for them in accounting procedures, and asked could we operate on some other basis and suggested and negotiated an agreement where we allowed them, in lieu of paying us three to five percent, to pay the utilities on the facility. They were estimated somewhere in the area of $1800 a month.

Therefore, that's the reason we allowed them to pay the utilities, instead of us taking a portion of the sales.

ties and the spread was rent for the lease of the site, it is a long leap to the conclusion that Farm Stores is a franchisee of motor fuel for purposes of the PMPA.

Perhaps the district court was led into error by focusing upon Congress' concern in the PMPA with the disparity of bargaining power between the ordinary franchisor and franchisee.[7] However, such concern employed by the district court in its "broader" independent businessman analysis can hardly be said to apply to a corporation of Farm Stores' size and sophistication. Farm Stores is not a "mom and pop" operation; it operates more than 265 retail outlets.

### (c) *Farm Stores is not an Independent Business Entity*

We believe the district court erred because it did not adhere to the clear language of the PMPA. Rather, the district court began its interpretation of the statute by seizing upon the antitrust language of *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), hypothesizing that the PMPA was intended to protect motor fuel marketers and dealers who have enough of the indicia of entrepreneurial responsibility and risk to be considered independent dealers and businessmen. By assuming that Farm Stores fell within the *Simpson* antitrust description of entreprenurial responsibility, the district court concluded that Farm Stores could be considered a "constructive retailer" or a "constructive distributor" even though it did not meet the statutory definitions. However, we believe the PMPA was not intended to protect every "independent businessman" engaged in the marketing of motor fuel. To be protected the businessman must be a "retailer" or "distributor," and have a "contract" with a "distributor" or "refiner." *See* § 2801.

Of course, *Simpson* involved the coercive use of a consignment device to market gasoline through a large number of retail dealers. The Court held that the dealers had "all or most of the indicia of entrepreneurs," and ruled that the consignment was nothing more than coercive vertical price-fixing in violation of the Sherman Act.

*Simpson,* an antitrust rather than a PMPA decision, is distinguishable on several significant grounds. First, in *Simpson,* the dealers bore market risk since their return was a commission tied to the retail price of the gasoline. Here, Texaco bore the entire market risk and paid Farm Stores only a fixed hourly rate for having an attendant present to collect the receipts from self-service gasoline sales. In *Simpson,* the dealers also bore the risk of loss of the gasoline, apart from acts of God. Here, the entire risk remained with Texaco, apart from tort negligence on the part of Farm Stores. In *Simpson,* the dealers paid "all the costs of operation in the familiar manner." *Id.* at 15, 84 S.Ct. at 1053. Here, Texaco built the station at great expense and paid the cost of gasoline inventory, business licenses, property taxes on the gasoline facility and on the gasoline, and maintained the facility and equipment. The dealers in *Simpson,* like Farm Stores, were required to carry liability insurance; but in *Simpson,* unlike Farm Stores, the dealers were also required to carry property damage insurance protecting the gasoline inventory and other assets of the business. *Id.* at 15, 84 S.Ct. at 1053. In *Simpson,* the dealers had "all or most of the indicia of entrepreneurs, except for price fixing." *Id.* at 20, 84 S.Ct. at 1056. Here, Texaco made the business decisions, priced the gasoline, and bore the major risks. Farm Stores' duties were more characteristic of an employee whose compensation was derived from an hourly wage and the privilege of selling groceries. It is similar to a situation where Texaco paid an employee to collect gas receipts and allowed him to augment his salary by selling bread and milk. The more gasoline customers, the more that employee—or Farm Stores—had the potential to sell groceries. However, the fact that grocery sales are affected by gasoline sales is not

---

7. *See supra* at Part III.

sufficient to create the market risks contemplated by Congress to give rise to a franchise which is protected by the notice termination provisions of the PMPA. The PMPA protects only franchises for the sale of motor fuel, not the sale of groceries.

#### (d) *The Hardwick Decision*

In this circuit the leading case analyzing independent business responsibility under *Simpson* is *Hardwick v. Nu-Way Oil Co., Inc.*, 589 F.2d 806 (5th Cir.1979), *cert. denied*, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979). *Hardwick* involved facts similar to the instant case. Hardwick and his wife had entered into an agreement with Nu-Way Oil Company to operate a self-service gasoline station. The Hardwicks were lessees (and later owners) of the real estate upon which they constructed a small building to house a drive-in grocery store. Pursuant to the agreement with the Hardwicks, on this site Nu-Way installed gasoline pumps, tanks and consoles. Nu-Way supplied all the gasoline. We observed in language we think dispositive of the case at bar:

> ... With respect to operation of the gasoline station, the indicia of an employment relationship are many. The agreement gave Nu-Way the right to install, at its sole cost, gasoline pumps, tanks, and electronic consoles that were necessary to operate a self-service gasoline station. Nu-Way retained all ownership of the gasoline sales equipment and maintained and repaired this equipment at its sole expense. Neither plaintiff [Hardwick] nor his wife ever carried insurance covering damage to the gasoline equipment, nor did they pay any taxes applicable to the gasoline nor any personal property taxes on the gasoline sales equipment. Nu-Way alone acquired and kept current all permits and licenses required by law for the gasoline sales operation and retained title to the gasoline itself until it was sold through the pump to the consumer. [Mrs.] Hardwick *was paid a fixed salary of $325 monthly without regard to the retail price of the gasoline or the number of gallons sold.*

> *For gasoline sales, the station operator only had the responsibility of collecting money from the customer.* The customer would drive to the pump, service his vehicle himself, and then go into the convenience store to pay for the gasoline. The operator [Hardwick] would verify the amount purchased on the electronic consoles inside the store and then would collect the money. The operator performed no collateral services as body repair work, lubrication, battery checks, oil changes, tire repair, tire checks, or even cleaning windshields. The operator was required to account weekly to Nu-Way for the sales registered on the pumps; to this end the station operator read the pumps daily and deposited the total dollar volume directly into a Nu-Way bank account. A Nu-Way supervisor verified the deposits by coming to the station twice a month to read the pumps and to check the bank deposits.... Nu-Way station operators were simply not in the position of independent retailers who purchased gasoline for resale to the public; in reality, *they were little more than salaried conduits to enable Nu-Way Oil to make retail sales directly to the consumer.*

589 F.2d at 809–11 (emphasis added).

Thus, in *Hardwick* we held that there was an employment relationship between the oil company and the Hardwicks, not a franchise. This decision was reached even where the Hardwicks owned the land upon which the station was built and despite the fact that they built the convenience store themselves. The key to our decision in *Hardwick* was the risk involved in the sale of motor fuel. It must be given the same controlling force here.

#### (e) *Texaco Bore the Risk*

As the district court correctly identified, "the most important indicia of being independent is the presence of economic risks." *Farm Stores, Inc. v. Texaco, Inc.*, 577 F.Supp. 682 (S.D.Fla.1983). We believe the district court, however, looked to the incorrect risk for purposes of application of the PMPA. We believe it clear that Texaco

was the risk bearer as to the sale of motor fuel. Unlike *Hardwick,* the entire investment in land and facilities was made by Texaco. The property was estimated to be worth more than $800,000. Texaco paid all property taxes, was responsible for maintaining all of the facilities in good repair, and bore the risk of loss of the entire fuel investment. In contrast, Farm Stores had no investment in the gasoline business. These facts strongly evince that Texaco, not Farm Stores, was the entrepreneur with respect to the sale of motor fuel and the application of the protective provisions of the PMPA. *Hardwick v. Nu-Way Oil Co., Inc.,* 589 F.2d 806, 810 (5th Cir.1979), *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979); *Goldinger v. Boron Oil Co.,* 375 F.Supp. 400, 407, 409 (W.D.Penn. 1974), *aff'd. mem.,* 511 F.2d 1393 (3d Cir. 1975), *cert. denied,* 423 U.S. 834, 96 S.Ct. 59, 46 L.Ed.2d 52 (1975); *Everhart v. United Refining Co.,* 1981 Tr.Cas. ¶ 63, 788 at 78,202, 78,203, and 78,208 (N.D.Ohio 1980); *Johnson v. Mobil Oil Corp.,* 553 F.Supp. 195, 199 (S.D.N.Y.1982).

The investment in gasoline inventory, about $40,000, was carried entirely by Texaco. Texaco retained title to the gasoline until it was sold to motorists, secured the necessary licenses, paid all taxes associated with the sale of the gasoline, and bore the risk of physical loss unless due to Farm Stores' negligence or misconduct. These activities are typical of an employer or principal. *See Hardwick, supra,* at 810 (retention of title, licenses and taxes); *Everhart, supra,* at 78,203 (permits and licenses); *Call Carl, Inc. v. B.P. Oil Corp.,* 554 F.2d 623, 628 (4th Cir.1977), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1974) (risk of accidental loss of gasoline).

Texaco also bore the risk of economic loss due to depressed prices and reduced sales volume, since Texaco was only paid as, and at the price that, the gasoline was sold to motorists. Farm Stores, on the other hand, was guaranteed a fixed hourly rate for operating the station. We believe the district court erred in inferring the indicia of entrepreneurial responsibility from findings that Farm Stores' profits

from the carwash and the convenience store were affected by the volume of gasoline sales. If independence is the test, it must be independence with respect to the sale of motor fuel. There is absolutely no basis for assuming that Congress intended the PMPA to benefit independent grocers or carwash operators. As stated in *Johnson, supra* at 200:

> The fact that plaintiff is an independent businessman with regard to one aspect of the station's operation does not necessarily entitle him to the protections of the PMPA, which protects franchisees only with respect to the sale of motor fuel. Although located at the same site, we think it proper to consider Johnson's repair business separate from Mobil's retail motor fuel operation for purposes of determining the applicability of the PMPA.

We made a similar distinction discussing business independence binding on this circuit for purposes of antitrust analysis in *Hardwick:*

> We hold that the agreement between Nu-Way and [Mrs.] Hardwick did not involve illegal price fixing because the station operator had no independence with regard to the gasoline sales, even though she was an independent businesswoman with regard to the convenience store operation. Although the two businesses were located at the same site, they were two separate and distinct operations and should be analyzed separately for antitrust purposes.

589 F.2d at 811.

The trial court stressed that Farm Stores hired its own employees, paid the utilities and the premiums for liability insurance, and was liable to Texaco for any negligence or malfeasance in the operation of the station. The last item is obviously consistent with an employment or agency relationship, *see e.g.,* Restatement Agency Second, § 402, and the courts have uniformly rejected attempts to attach significance to the others. *Hardwick, supra,* at 810 (station employee furnished personnel and paid

the operating expenses); *Goldinger, supra,* at 407, 409 (station employee hired and paid employees and paid operating expenses, including, at times, insurance and utilities); *Everhart, supra,* at 78,202 (employee paid the station's operating expenses including wages and payroll taxes, utilities, insurance and bonding costs, and other expenses); *see also Pogue v. International Industries, Inc.,* 524 F.2d 342, 343 (6th Cir.1975).

### V. *Conclusion*

The similarities between *Hardwick* and this case are overwhelming. With respect to the sale and dispensing of Texaco gasoline, Texaco owns and maintains the underground tanks, pumps, and all equipment and improvements. The retail customer pumps fuel directly from Texaco's tanks into his vehicle. Texaco determines the price at which it sells its gasoline to the motoring public. Texaco is entitled to all proceeds from the sale of the gasoline. Farm Stores bears no direct risk with respect to the sale of fuel. Farm Stores only contracted to post Texaco's price changes, maintain certain hours of operation and standards of appearance, and submit certain reports in a timely manner. Any argument that Farm Stores profits were affected by gasoline sales because they assisted the sale of carwashes and groceries is simply too attenuated to constitute the abuse Congress was attempting to rectify in the PMPA.

In summary, based on the *Hardwick* decision, Farm Stores clearly does not possess enough of the indicia of entrepreneurial responsibility to be deemed a "constructive retailer" or "constructive distributor." As such, Texaco gave timely notice of termination under the parties' contract.

REVERSED.